Filed 1/11/21; Certified for Publication 2/8/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOE MALDONADO et al., | |
| Plaintiffs and Respondents, | G058645 |
| v. | (Super. Ct. No. 30-2019-01073154) |
| FAST AUTO LOANS, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Glenda Sanders, Judge. Affirmed. Request for judicial notice denied.

Ballard Spahr and Marcos D. Sasso for Defendant and Appellant.

Cohelan Khoury & Singer, Isam C. Khoury, Michael D. Singer, and Kristina De La Rosa; Mesriani Law Group and Rodney Mesriani for Plaintiffs and Respondents.

In this putative class action, plaintiffs Joe Maldonado, Alfredo Mendez, J. Peter Tuma, Jonabette Michelle Tuma, and Roberto Mateos Salmeron (collectively referred to as "the Customers" unless otherwise indicated), assert Fast Auto Loans, Inc., (Lender) charged unconscionable interest rates on loans in violation of Financial Code sections 22302 and 22303. Lender filed a motion to compel arbitration and stay the action pursuant to an arbitration clause contained within the Customers' loan agreements. The court denied the motion on the grounds the provision was invalid and unenforceable because it required consumers to waive their right to pursue public injunctive relief, a rule described in *McGill v. Citibank, N.A.,* (2017) 2 Cal.5th 945 (*McGill*). On appeal, Lender asserts the "*McGill* Rule" does not apply, but even if it did, other claims were subject to arbitration. Alternatively, Lender contends the *McGill* Rule is preempted by the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.). We conclude Lender's contentions on appeal lack merit, and we affirm the court's order.

FACTUAL BACKGROUND

In May 2019, the Customers filed a class action complaint. The operative complaint is the first amended complaint (FAC) and alleges (1) violations of California's Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.), and (2) violations of the Consumers Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.).

In the FAC, the Customers asserted Lender's "business model is to charge exorbitantly high, usurious, and unconscionable interest rates, in direct violation of California law[.]" It alleged Lender was required "by the California Department of Corporations to be licensed as a California Finance Lender" but its license has been inactive. The Customers sought "disgorgement of ill-gotten profits, statutory damages, punitive damages, public injunctive relief, and attorney's fees and costs."

In the general allegations section of the FAC, the Customers stated the following: "[Lender offered loans] to California consumers, who are in immediate need of cash, at times for emergencies or to make ends meet and have limited credit

opportunities. [Lender] provides funding to these consumers subject to loan terms that most consumers are unable to repay in full or which impose such exorbitant interest rates and penalties that it causes the consumer to pay late, re-borrow, and/or default on other financial obligations. The result of this practice is that the vast majority of the loans made by [Lender] are essentially 'interest only' loans and/or subject to default and additional penalties."

The Customers explained Lender's "business model is to charge usurious interest rates so that most consumers . . . are forced to default on their obligations . . . or forced to roll over or re-borrow additional loans from [Lender] at dire and unconscionable interest rates." Consequently, "Consumers are locked in a vicious cycle of repaying many times the face value of the loan without significantly reducing the principal balance owed." One of Lender's business practices is to require their clients "to secure the loans with their personal vehicles" but will offer a loan amount that "exceeds [the] value of the car in order to induce the client to agree to the loan all the while knowing that the client cannot afford to repay this amount." In addition, Lender's practice is to misrepresent the nature of refinancing or modifying loans, falsely telling clients they are receiving better terms and interest rates. The Customers alleged Lender's "ultimate goal" is to "keep clients locked in contracts in perpetuity."

The FAC specifically described the terms of several loans offered to the Customers. Maldonado entered into three unsecured loans. In September 2018, Maldonado agreed to an unsecured loan of $2,819.65, having an annual percentage rate (APR) of 159.09 percent. In November 2018, Maldonado entered into an unsecured loan with an APR of 158.66 percent. In April 2019, Maldonado agreed to an unsecured loan with an APR of 159.09 percent. "The total finance charge for the principal balance of $3,044.60 amounted to $4,696.04, for a total of $7,739.64."

Each of these contracts "imposed an additional $10-15 penalty for each late payment." Additionally, each contained an arbitration provision. Maldonado exercised

3

his right to opt out of the arbitration provision in the April 2019 loan agreement and promissory note but not the other two contracts.

Mendez entered into two loan agreements with Lender. The first one in April 2017 was for $2,595 and had an APR of 180.06 percent. Mendez used his car as security for the loan. The following month, Mendez sought to refinance his prior loan and entered into another agreement using his car as collateral. The second loan had an APR of 174.70 percent and additional penalties for each late payment.

J. Peter Tuma and Jonabette Michelle Tuma were coborrowers on seven different loans with Lender. Using his car as collateral, J. Peter Tuma agreed in August 2016 to borrow $4,015 and pay an APR of 98.52 percent. He later refinanced this loan and agreed to an APR of 102.64 percent plus additional penalties for each late payment. Michelle Tuma used her vehicle as security for a loan in June 2015 for $7,035.30 having an APR or 84.23 percent. Two years later, in July 2017, she used her car as security for a $12,115.53 loan with an APR of 84.48 percent. In August 2017, she borrowed $14,998.53 (83.81 percent APR) using her car as collateral. In January 2018, she again used her car as security for a $14,559.30 loan (83.49 percent APR). Finally, in April 2018, she borrowed $16,069.50 (85.67 percent APR) and used her car as collateral.

Salmeron entered into four loan agreements. In May 2016, he borrowed $2,516 (122.08 percent APR) and used his car as collateral. In November 2016, he refinanced the loan (now having a principal amount of $5,522.36) and obtained a slightly lower APR of 118.57 percent. In May 2017, he borrowed $4,966 (119.85 percent APR) and again used his car to secure the loan. The following year, January 2018, Salmeron refinanced the May 2017 loan and agreed to an APR of 113.62 percent. His car was used as collateral for the loan.

The complaint's first cause of action, for UCL violations, alleged Lender's practices satisfied the "'unlawful'" and "'unfair'" prongs because it knowingly and intentionally issued loans with interest rates "unconscionable and objectively

4

unreasonable and prohibited by statute[.]" The FAC further alleged Lender violated the UCL by failing to maintain "active and lawful California [f]inancial [l]enders licenses as required by law." The Customers asserted they each suffered financial injury by paying Lender's unlawful interest rates.

The second cause of action was titled "injunctive relief and damages for violations of the [CLRA]." (Capitalization omitted.) The complaint alleged the Customers believed Lender's misconduct was "systematic and continuous, and continues to harm consumers who may be unaware that [Lender] subjects them to unconscionable loan provisions, including unconscionable and usurious loan rates which are prohibited by law." The Customers asserted Lender caused them to suffer economic losses and they believed the "harms are continuous and ongoing and are injurious to the public and consumers . . . ." The complaint stated the Customers would "seek an order from the [c]ourt requiring [Lender] to cease and desist its unlawful practices."

In the prayer for relief, the Customers requested the court to certify the lawsuit as a class action, determine Lender violated consumer protection statutory claims, and issue "a temporary, preliminary and/or permanent order for injunctive relief requiring [Lender] to: (i) cease charging an unlawful interest rate on its loans exceeding $2,500; (ii) and institute corrective advertising and provide written notice to the public of the unlawfully charged interest rate on prior loans[.]" The complaint sought a disgorgement of Lenders "ill-gotten gains to pay restitution" to the class members, distribution of any money recovered, payment of costs, interest, and actual damages permitted by Civil Code section 1780(a)(1)-(5). They sought attorney fees and "[p]ublic injunctive relief through the role as a [p]rivate [a]ttorneys [g]eneral prohibiting [Lender] from future violations of the aforementioned unlawful and unfair practices."

Lender filed a motion to compel arbitration, explaining each of the Customers' loan agreements included arbitration provisions. The last term of the agreement (No. 14) was comprised of 16 subdivisions (labeled paragraphs (a) through

(p)).  One paragraph stated a party could reject the arbitration provision if he or she mailed a written rejection notice following specific instructions.  Another one noted the arbitration provision was governed by the FAA because the agreement involved interstate commerce.

Relevant to this appeal, paragraph 14(d) stated the parties must arbitrate any claim (with a few exceptions) "that in any way arises from or relates to this Agreement or the Motor Vehicle securing this Agreement."  Paragraph 14(h), titled "*Class Action Waiver*" provided the consumer had no right to participate in or join "a class action, private attorney general action, or other representative action[.]"  (Bold omitted.)  Paragraph 14(n), titled "*Severability and Survival*" provided:  "If any part of this Arbitration Provision, *other than the Class Action Waiver*, is deemed or found to be unenforceable for any reason, the remainder shall be enforceable."  (Italics added.)   In short, the agreement required consumers to agree to individual, non-class arbitration.

Lender asserted the arbitration provision was broadly written to cover all of the Customers' claims.  In addition, Lender urged the court to enforce the agreement's Class Action Waiver (Class Waiver), which required arbitration take place on an individual basis and the arbitrator may only award relief on behalf of the named parties.  It argued the Customers' claim for public injunctive relief under the UCL and CLRA was "nothing more than a transparent attempt to rely upon the '*McGill* Rule' to avoid their contractual obligation to arbitrate what is actually an individual dispute relating to their Agreements."  The Customers opposed the motion, arguing the *McGill* Rule applied, and in addition, the agreement was procedurally and substantively unconscionable.

The trial court denied the motion.  In its minute order, the court explained the *McGill* Rule applied and the offending provision could not be severed under the terms of the arbitration agreement's paragraph stating severability did not apply to the Class Waiver provision.  It rejected Lender's attempts to factually distinguish the *McGill* case.

6

DISCUSSION

Lender argues the trial court erred by concluding the arbitration provision was unenforceable under *McGill, supra*, 2 Cal.5th 945, because the Customers did not seek a public injunction and, in any event, the FAA preempts *McGill* and requires enforcement of the provision. "Because all the issues raised in this appeal involve only questions of law, we review the trial court's order de novo. [Citation.]" (*Mejia v. DACM Inc.* (2020) 54 Cal.App.5th 691 (*Mejia*).) We conclude the contentions lack merit.

I. *The McGill Rule*

A different panel of this court recently published *Mejia, supra,* 54 Cal.App.5th 691, where we prepared a short primer on the *McGill* Rule that we repeat and incorporate here. "In *McGill, supra,* 2 Cal.5th 945, a credit card account holder filed a class action against the issuing bank alleging claims under the CLRA, UCL, and the false advertising law (Bus. & Prof. Code, § 17500 et seq.) for deceptive practices in offering a '"credit protector"' insurance plan. The complaint sought money damages, restitution, and an injunction prohibiting the bank 'from continuing to engage in its allegedly illegal and deceptive practices.' [Citation.] The Supreme Court noted such 'public injunctive relief, i.e., injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public,' is among 'the statutory remedies available for a violation of' the CLRA, the UCL, and the false advertising law. [Citation.] [¶] The bank in *McGill* petitioned to compel the account holder to arbitrate her claims on an individual basis based on an arbitration clause in the customer account agreement. The arbitration clause required arbitration of '"All Claims . . . ,"' and stated, '"Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis." . . . "The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither

7

you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court.'" [Citation.]" (*Mejia, supra,* 54 Cal.App.5th at p. 698, italics omitted.)

"The Supreme Court identified the issue in *McGill* as 'whether the arbitration provision is valid and enforceable insofar as it purports to waive McGill's right to seek public injunctive relief *in any forum*.' [Citation.] The high court concluded the arbitration clause had such a sweeping preclusive effect across all fora because the clause barred McGill from pursuing '"Claims and remedies"' on a class or representative basis in both arbitration and '"in any litigation in *any* court."' [Citation.] Having identified the issue, the court ruled the arbitration provision was 'invalid and unenforceable under California law' precisely because 'it purports to waive McGill's statutory right to seek [public injunctive] relief.' [Citation.] [¶] In explaining that conclusion, the Supreme Court cited Civil Code section 3513, which provides, in pertinent part, that '"a law established for a public reason cannot be contravened by a private agreement."' [Citation.] In other words, a statutory right created to serve a public purpose is *unwaivable.* The court stated, 'By definition, the public injunctive relief available under the UCL, the CLRA, and the false advertising law . . . is primarily "for the benefit of the general public." [Citations.]' [Citation.] Accordingly, the Supreme Court concluded, 'the waiver in a predispute arbitration agreement of the right to seek public injunctive relief under these statutes would seriously compromise the public purposes the statutes were intended to serve. Thus, insofar as the arbitration provision here purports to waive McGill's right to request in any forum such public injunctive relief, it is invalid and unenforceable under California law.' [Citation.]" (*Mejia, supra,* 54 Cal.App.5th at pp. 698-699.)

In the *Mejia* case*,* this court applied the *McGill* Rule. (*Mejia, supra,* 54 Cal.App.5th at pp. 702-703.) Plaintiff bought a used motorcycle from a dealership

8

(Del Amo) by paying $500 cash and financing the remainder with a WebBank-issued Yamaha credit card he obtained through the dealership. (*Id.* at p. 694.) Plaintiff applied for the credit card by signing a credit application "acknowledging he had received and read WebBank's Yamaha Credit Card Account Customer Agreement (the credit card agreement), which contained an arbitration provision." (*Ibid.*)

The arbitration terms in the *Mejia* case were remarkably like the ones we are reviewing in this case. (*Mejia, supra,* 54 Cal.App.5th at p. 694.) Plaintiff in *Mejia* agreed to a broadly written agreement to arbitrate any claims arising out of the credit agreement. The agreement also contained a class action waiver, that "specifically barred arbitration of all class, representative, or private attorney general claims[.]" (*Ibid.*) As in the case before us, the class waiver paragraph contained a "'poison pill' provision" specifying the following: "'If any portion of this Arbitration Provision *other than* [the Class Waiver provision] is deemed invalid or unenforceable, the remaining portions of this Arbitration Provision shall nevertheless remain valid and in force. If an arbitration is brought on a class, representative, or collective basis, and the limitations on such proceedings in [the Class Waiver provision] are finally adjudicated . . . to be unenforceable, *then no arbitration shall be had*.' (Italics added.)" (*Id.* at p. 695.)

The motorcycle dealership moved to compel arbitration, arguing the plaintiff was seeking private injunctive relief. (*Mejia, supra,* 54 Cal.App.5th at pp. 694-695.) It maintained plaintiff was not seeking to prevent future harm to the general public, but only to benefit members of his class of similarly situated individuals. This court disagreed, concluding the dealership's argument the public would not benefit from an injunction made "little sense." (*Id.* at p. 702.) "[Plaintiff's] brief demonstrates the illogic of Del Amo's argument. [Plaintiff] points out his prayer seeks an injunction forcing Del Amo to cease 'selling motor vehicles in the state of California without first providing the consumer with all disclosures mandated by Civil Code [section] 2982 in a single document.' [Plaintiff] asserts, '[T]he prayer is plainly one for a public injunction

9

given that Mejia "seeks to enjoin future violations of California's consumer protection statutes, relief oriented to and for the benefit of the general public." [Citation.] [¶] . . . [Plaintiff's] prayer does not limit itself to relief only for class members or some other small group of individuals; it encompasses "consumers" generally. [Citation.]'" (*Id.* at p. 703.)

In the *Mejia* opinion, this court reviewed the distinctions made between private and public injunctions. "The [Supreme Court's *McGill*] opinion defined 'private injunctive relief' as 'relief that primarily "resolve[s] a private dispute" between the parties [citation] and "rectif[ies] individual wrongs" [citation], and that benefits the public, if at all, only incidentally[.]' [Citation.] The opinion defined 'public injunctive relief' as 'relief that "by and large" benefits the general public [citation] and that benefits the plaintiff, "if at all," only "incidental[ly]" and/or as "a member of the general public" [citation].' [Citation.] The high court cited as an example of a public injunction 'an injunction under the CLRA against a defendant's deceptive methods, acts, and practices [which] "generally benefit[s]" the public "directly by the elimination of deceptive practices" and "will . . . not benefit" the plaintiff "directly," because the plaintiff has "already been injured, allegedly, by such practices and [is] aware of them." [Citation.] "[E]ven if a CLRA plaintiff stands to benefit from an injunction against a deceptive business practice, it appears likely that the benefit would be incidental to the general public benefit of enjoining such a practice." [Citation.]' [Citation.]" (*Mejia, supra,* 54 Cal.App.5th at p. 703.) We concluded in *Mejia* that the "injunctive relief Mejia prays for in the complaint fits the Supreme Court's definition of 'public injunctive relief' in *McGill* . . . [and there was] no merit to Del Amo's argument *McGill* is inapplicable because Mejia does not seek public injunctive relief." (*Id.* at pp. 703-704.)

This case is distinguishable from those where a plaintiff seeks a private injunction of similarly situated persons. A different panel of this court recently published *Clifford v. Quest Software* (2019) 38 Cal.App.5th 745 (*Clifford*), where we held the

10

plaintiff praying for injunctive relief could not avoid arbitration of a UCL claim under the *McGill* Rule. In the *Clifford* case, an employee brought various wage and hour claims against his employer. (*Id.* at p. 747.) We pointed out how the private nature of the UCL claim was "immediately evident" from the face of the complaint. "In describing [the employer's] alleged acts of unfair competition, [the employee's] complaint repeatedly refers to wage and hour violations directed at [the *employee*] *only*, such as [the employer's] 'failures to pay [the *employee*] all earned overtime and premium-pay wages,' [the employer's] failure 'to reimburse [the *employee*] for all necessary expenditures or losses incurred by [the *employee*][.]' . . . [the employee] does not allege [the employer's] directed similar conduct at other employees, much less the public at large. [¶] [The employee's] requests for injunctive relief under the UCL are similarly limited to him as an individual. He alleges [the employer's] 'unfair business practices entitle [*him*] to seek preliminary and permanent injunctive relief, including but not limited to orders that [the employer] account for, disgorge, and restore to [*him*] all compensation unlawfully withheld.' (Italics added.) . . . The only express beneficiary of [the employee's] requested injunctive relief is [himself], and the only potential beneficiaries are [the employer's] current employees, not the public at large." (*Id.* at p. 753.)

II. *The McGill Rule Applies Here*

Lender asserts the court erred by failing to consider whether the Customers "were *actually* seeking public injunctive relief" as required by the *McGill* case and its progeny. It asserts that although the Customers requested a public injunction in the complaint, the relief sought "is private because it will, at best, benefit [the Customers] and a discrete, narrowly-defined group of other . . . customers." It elaborates the narrow group is a class of similarly situated individuals who would borrow money from Lender and agree to a similar arbitration provision. As was the case in *Mejia*, we conclude the argument makes little sense if one looks at all of the allegations in the complaint.

11

Lender's assertion the Customers seek a private injunction is based on the opening paragraph of the complaint, where the Customers introduced themselves as "individually and on behalf of all other similarly situated, bring[ing] this class action against [Lender] . . . to seek recompense for themselves and other similarly-situated California consumers who take out personal loans from [Lender]." This is language typically used in a class action lawsuit. The proposed class, described in paragraphs 50 through 55 of the complaint, are "persons who obtained loans . . . in an amount more than $2,500.00 from [Lender]."

Lender ignores the operative allegations and specific requests for relief located in sections VI (describing basis for causes of action) and VII (the prayer for relief) of the complaint. In these sections, the Customers alleged Lender's misconduct was ongoing and "injurious to the public and consumers[.]" Because Lender was continuing to provide high interest loans without proper licensing, the consumers alleged the "unlawful conduct will continue" unless the court takes "action to enjoin said practices." They specifically listed in the complaint's prayer "[p]ublic injunctive relief" prohibiting "future violations of the aforementioned unlawful and unfair practices[.]" The Customers clarified the injunctive relief should require Lender to stop charging unlawful interest rates and adopt "corrective advertising."

In short, the Customers' complaint and prayer does not limit the requested remedies for only some class members, but rather encompasses all consumers and members of the public. Moreover, an injunction under the CLRA against Lender's unlawful practices will not directly benefit the Customers because they have already been harmed and are already aware of the misconduct. As stated in *McGill,* any benefit to the Customers is incidental to the "general public benefit of enjoining such a practice.' [Citation.]" (*McGill, supra,* 2 Cal.5th at p. 955.)

Lender attempts to limit the reach of the *McGill* Rule by suggesting it only applies to plaintiffs seeking to enjoin *false or misleading advertising* on behalf of the

12

general public.  We are not persuaded.  California's consumer protection laws must be liberally, not narrowly, applied.  "The Legislature enacted the CLRA 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.'  [Citation.]  '[T]o promote' these purposes, the Legislature directed that the CLRA 'be liberally construed and applied.'  [Citation.]"  (*McGill, supra*, 2 Cal.5th at p. 954.)  The "CLRA authorizes any consumer who has been damaged by an unlawful method, act, or practice to bring an action for various forms of relief, including '[a]n order enjoining the methods, acts, or practices' [citation]."  (*Ibid.*)  Similarly, the purpose of the UCL "'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'  [Citation.] . . .  '[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction.'  [Citation.]"  (*Ibid.*)  We found no case, and Lender cites to none, holding the remedy of public injunctions under CLRA and UCL should be limited to false advertising claims.

We are also unpersuaded by Lender's argument this lawsuit challenges only the interest rates charged in the putative class members' loans, and therefore, they primarily seek private relief with the injunction.  To accept this argument, we would have to ignore the complaint's unequivocal request to enjoin Lender from harming other consumers *in future contracts* from outrageous interest rates.  As stated above, the consumers have nothing to personally gain from an injunction stopping Lender from imposing high interest rates in future contracts with members of the public.  We agree with the Customers' assertion that although "not all members of the public will become customers of [Lender]" this "does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public."  The requested injunction cannot be deemed private simply because Lender could not possibly advertise to, or enter into agreements with, every person in California.  Such a holding would allow Lender to continue violating the UCL and CLRA because consumers harmed by the unlawful

13

practices would be unable to act as a private attorney general and seek redress on behalf of the public.  It is enough that the requested relief has the purpose and effect of protecting the public from Lender's ongoing harm.

Moreover, the Ninth Circuit in *Blair v. Rent-A-Center, Inc.* (9th Cir. 2019) 928 F.3d 819, 831, footnote 3 (*Blair*), summarily rejected an argument similar to Lender's contention.  It held the *McGill* Rule applied where the plaintiff "s[ought] to enjoin *future violations* of California's consumer protection statutes, relief oriented to and for the benefit of the general public."[1]  (*Ibid.,* italics added*.*)  Additionally, we must follow the *McGill* case, where our Supreme Court held a complaint sought public injunctive relief where it "request[ed], among other things, an injunction prohibiting Citibank from *continuing to engage* in its allegedly illegal and deceptive practices." (*McGill, supra*, 2 Cal.5th at p. 953, italics added.)[2]

III.  *Class Waiver Not Severable*

Lender asserts the trial court also erred by concluding the entire arbitration provision was unenforceable simply because the Class Waiver clause was invalid.  The trial court relied on two sections of the agreement discussing the issue of severability.

---

[1]      Lender cites to several federal court cases that are not only outdated, but also not binding on this court.  We note the Ninth Circuit in *Blair,* and more recently in *Roberts v. AT&T Mobility LLC* (9th Cir. 2020) 801 Fed.Appx. 492, 496, supported application of the *McGill* Rule when a plaintiff seeks to enjoin *future violations* of the CLRA and UCL.

[2]      At oral argument, Lender discussed an issue briefly mentioned in its reply brief.  It maintained the case should be remanded in light of the Legislatures' recent enactment of Financial Code section 22304.5, subdivision (a) [prohibiting finance lenders from issuing loans between $2,500 and $10,000 with high interest rates].  This provision took effect January 1, 2020, and Lender does not explain why this contention was not included in its opening brief (filed at the end of May 2020), giving Customers a fair opportunity to respond.  We need not consider issues raised for the first time in a reply brief, and in any event, this class action specifically alleged Lender executed a loan greater than $10,000 to one of the named plaintiffs (Michelle Tuma).  There is no question a public injunction would still prevent a threat of future harm to others.

The agreement's "*Severability and Survival*" provision (paragraph 14n) clearly stated, "If any part of this Arbitration Provision, other than the Class Action Waiver, is deemed or found to be unenforceable for any reason, the remainder shall be enforceable." The Class Waiver provision (paragraph 14h) contained a "poison pill" statement clarifying the issue as follows: "The parties acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between them and is non-severable from this Arbitration Provision. If the Class Action Waiver is limited, voided or found unenforceable, then this Arbitration Provision (except for this sentence) shall be null and void with respect to such proceedings, *subject to the right to appeal* the limitation or invalidation of the Class Action Waiver. The parties acknowledge and agree that under no circumstances will a class action be arbitrated." (Italics added and bold omitted.)

Focusing on the "poison pill" provision, Lender argues the trial court misinterpreted the contract. It proposes that the "subject to the right to appeal" language, italicized above, means the arbitration agreement "does not become null and void unless and until an appeal has been taken from an adverse ruling, and that appeal does not succeed in overturning the trial court's ruling." (Italics and bold omitted.) Alternatively, Lender suggests that if there is any ambiguity in the contractual language it must be construed in favor of arbitration.

Thus, it is Lender's theory that the trial court could not declare the entire arbitration agreement void *until after* this appellate court reviews the viability of the Class Waiver. Lender argues the trial court should have ordered the Customers to arbitrate their claims for damages, disgorgement, and restitution while Lender's appeal about the Class Waiver ruling was pending. This argument raises obvious questions about what should happen if Lender decided not to appeal. The Customers would not have standing to appeal a favorable ruling. Indeed, we agree with the Customers' assertion Lender's argument is illogical because it requires the appellate court to initially determine the agreement is invalid before the trial court.

15

We conclude Lender's interpretation of the agreement is incorrect, and in any event, the argument is now moot. As predicted by the Customers, because we have determined the Class Waiver was unenforceable, it follows that the entire arbitration provision becomes void as clearly and unambiguously stated in paragraphs 14(h) [poison pill provision] and 14(n) [severability and survival provision]. If for the sake of argument, we were to accept Lender's interpretation of the "subject to the right to appeal" language, we could not say the trial court erred by denying the motion to arbitrate. After all, we have reached the same conclusion as the trial court. It is no longer relevant the trial court's order may have been premature.[3]

In any event, we do not interpret the agreement as requiring an appellate decision before the trial court could apply the poison pill or severability provisions of the agreement. Both paragraphs 14(h) and 14(n) clearly and unambiguously state the arbitration provisions cannot be saved if the Class Waiver is deemed invalid. The Class Waiver was unequivocally deemed "non-severable."

We interpret the "subject to" language, when read in context of the entire paragraph, as simply acknowledging Lender's right to appeal the decision and enforce the Class Waiver limitations if successful on appeal. Looking first to the beginning of the paragraph, it contained the parties' unequivocal acknowledgment that "the Class Action Waiver is material and essential to the arbitration of any disputes between them and is non-severable from this Arbitration Provision." The next sentences provided that if the Class waiver provision was "found unenforceable, then this Arbitration Provision (except for this sentence) shall be null and void with respect to such proceedings, *subject to the*

---

[3] What would be relevant and prejudicial is if the trial court had accepted Lender's interpretation and ordered the Customers to arbitrate their claims for damages and restitution while this appeal was pending. Any award could not be confirmed after this court issued an opinion concluding the claims were not arbitrable. To avoid this predictable result, a trial court would be required to stay all arbitration pending the outcome of the appeal. Lender's interpretation leads to an absurd outcome.

16

*right to appeal* the limitation or invalidation of the Class Action Waiver. (Italics added.) The comma before the phrase "subject to the right to appeal" signifies separate independent clauses. As written, the agreement does not make the "null and void" clause conditional on the rendering of an appellate opinion. It merely confirms that Lender has the right to appeal, and if successful, enforce the Class Waiver. If Lender intended to qualify the timing of severability and survival of the agreement, the sentence should have stated the arbitration provisions could not be deemed null and void until *after* Lender completed its appeal of the ruling.

## V. *The FAA Preemption Question*

Lender's final argument is the FAA preempts *McGill*. It recognizes our California Supreme Court in *McGill* held there is no preemption. (*McGill, supra,* 2 Cal.5th at p. 953.) In its briefing, Lender notes two telecommunication companies, AT&T Mobility LLC and Comcast Corporation, have asked the United States Supreme Court overturn the Ninth Circuit in two companion cases ruling the FAA does not preempt the *McGill* Rule. It asserts we should stay this appeal until the high court renders a decision. Encouraged by these pending petitions, Lender presents a lengthy argument about why our Supreme Court incorrectly decided the *McGill* case.

As noted by the Customers in their briefing, on June 1, 2020, the Supreme Court denied review of the Ninth Circuit rulings. (*AT&T Mobility LLC v. McArdle* (2020 ___U.S.___) 140 S.Ct. 2827, 207 L. Ed. 2d 159; *Comcast Corp. v. Tillage* (2020 ___U.S.___) 140 S.Ct. 2827, 207 L. Ed. 2d 158.) Insofar as Lender thinks *McGill* was wrongly decided, the argument fails, as we are bound to follow the precedent of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, we find its analysis to be legally sounds and persuasive, as does the

17

Ninth Circuit.[4] (*Blair, supra,* 928 F.3d at p. 822 [FAA does not preempt the *McGill* Rule]; *Tillage v. Comcast Corp.* (9th Cir., June 28, 2019) 772 Fed.Appx. 569; *McArdle v. AT&T Mobility LLC* (9th Cir., 2019 June 28, 2019) 772 Fed.Appx. 575.) We conclude Lender's arguments the FAA preempts the *McGill* Rule lack merit, and there is no basis to stay this appeal.

DISPOSITION

The order is affirmed. Appellant's motion for judicial notice of documents relating to Lender's licensing is denied because the information was not before the trial judge and not relevant to our analysis. Respondents shall recover their costs on appeal.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

---

[4] In *Blair,* the court explained in a footnote that "the panel received briefing and heard argument in two additional cases raising this same question: *McArdle v. AT&T Mobility LLC* (No. 17-17246), and *Tillage v. Comcast Corp.* (No. 18-15288). Those cases are resolved in separate memorandum dispositions filed simultaneously with this opinion." (*Blair, supra*, 928 F.3d at p. 822, fn. 1.)

Filed 2/5/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOE MALDONADO et al., | |
| Plaintiffs and Respondents, | G058645 |
| v. | (Super. Ct. No. 30-2019-01073154) |
| FAST AUTO LOANS, INC., | ORDER |
| Defendant and Appellant. | |

The Center for Consumer Law & Economic Justice, Bet Tzedek, Consumers for Auto Reliability & Safety, and the Housing & Economic Rights Advocates have requested that our opinion filed January 11, 2021, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.